IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MICHAEL W. MCCARTNEY,

   Plaintiff,

   v.           Civil Action No. 5:07-CV-103

MICHAEL J. ASTRUE,
Commissioner of Social Security,

   Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A. Background

  Plaintiff, Michael W. McCartney, (Claimant), filed his Complaint on August 13, 2007,

seeking Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on October

22, 2007.[2]  Claimant filed his Motion for Summary Judgment on November 26, 2007.[3]

Commissioner filed his Motion for Summary Judgment on January 22, 2008.[4]

B. The Pleadings

  1. Plaintiff's Memorandum in Support of Motion for Summary Judgment.

  2. Defendant's Brief in Support of His Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket No. 10.

[4] Docket No. 14.

C.    Recommendation

I recommend that:

1.    Claimant's Motion for Summary Judgment be **DENIED** because 1) substantial evidence supports the ALJ's conclusion Claimant did not suffer from a severe mental impairment, and 2) there is no evidence the ALJ failed to meet his burden at step five of the sequential analysis.

2.    Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

## II. Facts

A.    Procedural History

Claimant filed an application for Supplemental Security Income on August 15, 2004, alleging disability since February 15, 2002 due to reactive airway disease syndrome (RADS), skin disease resulting from occupation accident, a deformed left arm, nerve damage to the surface nerves, legs, and arm. (Tr. 133). The application was denied initially on January 7, 2005, and upon reconsideration on May 12, 2005. (Tr. 58-59). Claimant requested a hearing before an ALJ and received a hearing on March 1, 2006. On April 17, 2006, the ALJ issued a decision adverse to Claimant. Claimant requested review by the Appeals Council but was denied. Claimant filed this action, which proceeded as set forth above.

B.    Personal History

Claimant was thirty-seven years old on the date of the March 1, 2006 hearing before the ALJ. Claimant graduated from college with a bachelors degree in biology and criminal justice, and has prior work experience as a laborer. (Tr. 125, 130).

C.    <u>Medical History</u>

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: February 15, 2002 through April 17, 2006.

**Dr. Robert Benzo, M.D., 5/8/03 (Tr. 281)**
<u>Assessment/Recommendations</u>: . . . Mr. McCartney is depressed by his lack of work at this time, and I believe he needs some assistance from psychologists or psychiatrists to help with the symptoms of reactive depression that he seems to have, even though this is not my area of expertise.

**Dr. Alan Ducatman, M.D., 4/13/03 (Tr. 284)**
 . . . In addition I formed an impression of a patient with limited intellectual and/or emotional means to express himself (this impression requires formal confirmation if important). . . . Actively seeking this kind of job is a worthwhile goal, yet it must occur in the context [of] Mr. McCartney's intellectual or emotional means, which I take to be limited.

**Dr. Robert Benzo, M.D., 12/6/02 (Tr. 288)**
<u>Subjective</u>: Mr. McCartney seems very distressed by his current situation in which he is almost unable to do any significant activity according to his saying.
<u>Objective</u>: He looks mentally distressed but in no respiratory distress at all.

**Dr. Robert Benzo, M.D., 8/30/02 (Tr. 292)**
<u>Objective</u>: On physical examination, the patient looks in no distress.

**Dr. Robert Benzo, M.D., 6/28/02 (Tr. 295)**
<u>Review of systems</u>: His sleeping is okay.
<u>Physical examination</u>: . . . He looks not very communicative.

**Alan Ducatman, M.D., 6/25/02 (Tr. 300)**
<u>Physical Examination</u>: Reveals a pleasant individual . . . .
<u>Impression</u>: Social problems, as noted above.

**Dr. Brown, DDS Physician, 8/19/03 (Tr. 313)**
<u>Physical RFC Assessment</u>
Exertional Limitations
    Occasionally lift and/or carry - 20 pounds
    Frequently lift and/or carry - 25 pounds
    Stand and/or walk  - about 6 hours in an 8-hour workday.
    Sit - about 6 hours in an 8 hour workday
    Push and/or pull - unlimited, other than as shown for lift and/or carry
Postural Limitations: Climbing/Balancing/Stooping/Kneeling/Crouching/Crawling: occasionally
Manipulative Limitations: none established

Visual Limitations: none established
Communicative Limitations: none established
Environmental Limitations: avoid concentrated exposure to extreme cold/heat/wetness/fumes, etc.
Comments: Should reduce RFC to light because of reactive airways dysfunction whenever exposed to any dust or fumes - also should avoid hot and cold climates.  RFC of light also due to congenital defect of left upper extremity.

**Dr. Samuel Goots, Ph.D., DDS Physician, 8/20/03 (Tr. 315)**
Psychiatric Review Technique
Medical Dispositions: Impairment(s) not severe.
Category(ies) upon which the medical disposition is based: 12.04 Affective Disorders.
Affective Disorders: A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: Depression and physical problems.
Functional Limitation for Listings 12.04
      Restriction of Activities of Daily Living: Mild
      Difficulties in Maintaining Social Functioning: Mild
      Difficulties in Maintaining Concentration, Persistence or Pace: Mild
      Episodes of Decompensation, each of extended duration: None
"C" Criteria of the Listings: Evidence does not establish the presence of the "C" Criteria
Consultant's Notes: 4/03 Referral (recommendation) for reactive depression. 0 meds. Depression secondary to physical limitations.

**Dr. Bennett Orvik, M.D., 12/21/04 (Tr. 413)**
Diagnosis and Impression: . . . 5) Depression. . . .

**Dr. Frank Roman, Ed.D., DDS Physician, 1/07/05 (Tr. 449)**
Psychiatric Review Technique
Medical Dispositions: Impairment(s) not severe.
Category(ies) upon which the medical disposition is based: 12.04 Affective Disorders.
Affective Disorders: A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: Depression.
Functional Limitation for Listings 12.04
      Restriction of Activities of Daily Living: Mild
      Difficulties in Maintaining Social Functioning: Mild
      Difficulties in Maintaining Concentration, Persistence or Pace: Mild
      Episodes of Decompensation, each of extended duration: None
"C" Criteria of the Listings: Evidence does not establish the presence of the "C" Criteria

**Dr. M. Rahman, M.D., 2/4/05 (Tr. 464)**
Assessment and Plan: . . . He has anxiety depression.

**Dr. M. Rahman, M.D., 11/10/04 (Tr. 465)**
Assessment and Plan: For his anxiety depression, he takes Celexa 40 mg once a day.

**Dr. M. Rahman, M.D., 9/1/04 (Tr. 466)**

Assessment and Plan: He has anxiety depression and will continue Celexa 40 mg once a day.

**Dr. M. Rahman, M.D., 5/12/04 (Tr. 467)**

Assessment and Plan: Mr. McCartney is a 35 year old male with a history of . . . depression. He has anxiety depression and will continue Celexa 40 mg once a day.

**Dr. Fulvio Franyutti, M.D., DDS Physician, 5/9/05 (Tr. 501)**

Physical RFC Assessment

Exertional Limitations

 Occasionally lift and/or carry - 50 pounds

 Frequently lift and/or carry - 25 pounds

 Stand and/or walk  - about 6 hours in an 8-hour workday.

 Sit - about 6 hours in an 8 hour workday

 Push and/or pull - unlimited, other than as shown for lift and/or carry

Postural Limitations:

 Climbing/Balancing: occasionally.

 Stooping/Kneeling/Crouching/Crawling: frequently

Manipulative Limitations: Reaching all directions - limited, left arm and left hand.

Visual Limitations: none established

Communicative Limitations: none established

Environmental Limitations: avoid concentrated exposure to extreme cold/heat//fumes, etc./hazards, etc.

Comments: Should reduce RFC to light because of reactive airways dysfunction whenever exposed to any dust or fumes - also should avoid hot and cold climates. RFC of light also due to congenital defect of left upper extremity.

**Dr. Pearson, M.D., 5/3/07 (Tr. 598)**

-Mike comes in today with many complaints, but primarily for chronic pain and feeling suicidal. . . . He was seen at the UHC ER last week as he was suicidal where he was given Percocet which seemed to help his pain somewhat. He had a gun but was unable to pull the trigger secondary to his arm deformity. He denies suicidal ideation today. . . . He is currently on Celexa 40 mg per day for the last 18 months. He doesn't believe it helps as he's still depressed. He believes he has more bad than good days. He occasionally sleeps all the time and at other times he doesn't sleep at all. He says he has no energy and his appetite fluctuates. He is in a lot of pain. His wife left him 2 weeks ago. They have been married 3 years. She wants children but he says it even hurts him to perform and he is worried about taking care of himself and therefore is concerned about having children. He says his wife wants to move but there are money issues. This all led to his suicidal ideation with the gun. Again, he denies suicidal ideation today.

-He is alert and pleasant with good eye contact.

-Assessment: 1) Neuropathy; 2) Depression; 3) Chronic neck pain; 4) Herniated discs at L4-L5-L6.

**Joseph Shaver, Ph.D., 9/5/06 (Tr. 607)**
Mental Residual Functioning Capacity Assessment
Understanding and Memory:
Ability to remember locations and work-like procedure: not significantly limited
Ability to understand and remember very short and simple instructions: not significantly limited
Ability to understand and remember detailed instructions: moderately limited
Sustained concentration and persistence
Ability to carry out very short and simple instructions: not significantly limited
Ability to carry out detailed instructions: moderately limited
Ability to maintain attention and concentration for extended periods: not significantly limited
Ability to perform activities within a schedule, maintain regular attendance and be punctual
     within customary tolerances: moderately limited
Ability to sustain an ordinary routine without special supervision: not significantly limited.
Ability to work in coordination with or proximity to others without being distracted by them:
     moderately limited.
Ability to make simple work-related decisions: not significantly limited
Ability to complete a normal work-day and workweek without interruptions from
     psychologically based symptoms and to perform at a consistence pace without an
     unreasonable number and length of rest periods: moderately limited.
Social Interaction
Ability to interact appropriately with the general public: not significantly limited
Ability to ask simple questions or request assistance: not significantly limited
Ability to accept instructions and respond appropriately to criticism from supervisors: not
     significantly limited
Ability to get along with coworkers and peers without distracting them or exhibiting behavioral
     extremes: not significantly limited
Adaptation
Ability to respond appropriately to changes in the work setting: not significantly limited
Ability to be aware of normal hazards and to take appropriate precautions: not significantly
     limited
Ability to travel in unfamiliar places or use public transportation: not significantly limited
Ability to set realistic goals or make plans independently of others: not significantly limited
Functional Capacity Assessment: Claimant is a 37 year old male alleging a mental disability on
the basis of depression.  He also reports suffering from multiple physical conditions including
restricted airway syndrome, neuropathy in legs, chest, arms and carpal tunnel syndrome.  MSE
(8/28/06) indicates that Claimant was cooperative, compliant and oriented x 4.  His mood was
described as dysphoric with a restricted affect.  Insight, recent memory and persistence were
moderately impaired with concentration and remote memory being mildly deficient.  Pace was
rated as being severely impaired.  On the other hand, judgment and immediate memory fell
WNL.
          Axis I: MDD, recurrent, severe, w/o psychotic features.
          Axis II: No Dx.
Claimant appears to be generally credible regarding his reported mental functioning.  He
sometimes fixes sandwiches, loads the dishwasher, vacuums, uses a riding lawn mower and does

laundry.  Claimant also drives occasionally and shops with his wife.  He attends church twice weekly, visits and fishes with a friend.  It is believed that Claimant retains the mental capacity to operate in routine, low stress, work situations that require only two to three step operations.

**Dr. Morgan, M.A., 8/29/06 (Tr. 611)**

Presenting symptoms: The client has a history of recurrent depressive episodes.  He described his current mood as dysphoric on most days.  His attention and concentration is diminished.  He reported problems with recall. He is socially withdrawn and reported a diminished libido.  He frustrates easily and displays irritability. . . . He reported no past suicide attempts or any current plan of suicide.  He did report transient ideations, but did not report any serious intent within this ideation.

Mental Status Examination:  . . . He was cooperative and compliant throughout the assessment, although rather tense and avoidant when queried on a few subject matters.  His eye contact was good.  His spontaneity was mildly deficient.  The length and depth of his verbal responses were within normal limits.  The client's demeanor depicted an overall history of extroversion, although his mood symptoms have brought about social withdrawl. . . . He was oriented to time, name, place, and date.  His mood was dysphoric and his affect was restricted.  The client did not display symptoms of psychosis.  His insights were deemed moderately deficient, based on his statements during the course of the assessment.  The client's judgments were deemed to be within normal limits based upon his statements during the course of the assessment.  He does not display signs or symptoms of suicidal or homicidal ideation.  His immediate recall was deemed to be within normal limits, as he was capable of immediate recall of all four words.  His recent recall was deemed to be moderately deficient, as the client was later capable of producing only two of the four words after a 30-minute delay.  The client's remote recall was deemed to be mildly deficient, based upon his ability to produce historic and personal facts.  The client's concentration was deemed mildly deficient, based upon his scaled score of 7 on the Digit Span subtest of the WAIS-III.  He displayed motor retardation and motor tension during the assessment.

Objective symptoms: The client was generally cooperative and compliant during the assessment. . . . His immediate recall was deemed to be within normal limits.  His recent recall was deemed to be moderately deficient.  His remote recall was deemed to be mildly deficient.  The client's concentration was deemed to be mildly deficient.  His motor behavior was retarded and he displayed motor tension.  The client's past academic achievement would suggest at least an average intelligence.

Diagnostic Impressions:

  Axis I: Major depressive disorder, recurrent, severe, without psychotic features.
  Axis II: No diagnosis.
  Axis III: Reported damaged lungs, loss of breathing capacity, neuropathy, lower back pain.

D.    Testimonial Evidence

Testimony was taken at the March 1, 2006 hearing.  The following portions of the

testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ATTORNEY]  (Tr. 653)

Q     All right.  Do you suffer from crying spells?

A     Yeah.

Q     How often does that happen?

A     Sometimes twice a week.

Q     And when that happens, do you know why you're crying?

A     No, sometimes I just start crying; and then I think about how my life turned out

and -

Q     Okay.

A     - - getting hurt, I mean, I'm still angered about it, but - -

Q     How long do you cry when you cry?

A     Sometimes on and off all day.

Q     When that happens, do you have to get away from people?

A     Yeah, I - - my wife gets where she'll come in and I'll just be staring and crying,

and she'll tell me everything will be all right.  That's about it.

Q     Have you thought about hurting yourself?

A     Yeah.

Q     How often does that occur?  Do you - -

A     I haven't had any - - maybe one spell since I got married.  But - -


[EXAMINATION OF WITNESS BY ATTORNEY]  (Tr. 660)

Q        Okay.  Does he suffer depression?

A        Yes, sir.

Q        How do you know he suffers depression?

A        I can tell by looking at him.

Q        What do you see?

A        I see staring off in the distance.  He's silent.  He avoids people.  Sometimes he breaks down and cries.  He'll sit there and have crying spells.

Q        What is his energy level like during the day?

A        He doesn't have an energy level.  It's just get up and go because he has to.

Q        Are there days when he doesn't get out of bed all day?

A        Sometimes there are weeks like that.  It depends on if he's sick.

Q        Uh-huh.

A        Usually if he's depressed, he won't get out of bed for two to three days until his medicine starts kicking in and he's better.

Q        Does he have any interest in anything going on outside the house right now?

A        He likes his dogs.  He likes to watch his dogs.  When he can, he likes to work around the outside of the house.

Q        Doing what?

A        Piddling.  Probably took him two months to put up underpinning on our trailer. Just when he could do it on the good days.

Q        And how long will he work at something like that at a time before he has to quit?

A        I'd say at the most two and a half hours before he needs a break, but he can't do it

steady.  He has to take breaks in between.

*          *          *

[EXAMINATION OF WITNESS BY ALJ]  (Tr. 663)

Q        You haven't said anything positive about your husband.  Everything seems to be negative.

A        The positive sides about him - -

Q        Uh-huh.

A        - - are that he supports me and he supports others.  He's a very, very loving and giving.

Q        Even with all the depression and the staring and the crying spells?

A        Yes, sir.  Well, when those are over, the things that get him back up and going are the fact that I love him and I need him to be strong for me; and that maybe just maybe he can sit with an older person or hug a child or do something to let other people know that he cares.  It's not all about him.  But the questions I was asked were specific to his depression.

Q        The conditions you describe, was it that bad when you got married?

A        Yes, sir.  Before we got married, in dating.

Q        I mean, the depression - -

A        Yes.

Q        - - the crying spells - -

A        Yes.

Q        - - and not being able to do anything and he can't walk - -

A        I would say it was worse than - - since we've gotten married because now he has

10

something to live for and something to push for.

*       *       *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]  (Tr. 666)

Q        Okay.  Let's try a hypothetical of a younger individual with a high school plus education.  This first hypothetical would have this person lifting only 20 pounds occasionally, ten frequently, with the lifting being done principally with the right arm, left arm being used for balance, to use Mr. McCartney's word; no pushing or pulling with the left upper extremity; very limited walking at the job site.  Is that good enough?  Do you need a time on that or - -

A        It's up to you - -

Q        Hum?

A        It's your call.

Q        Well, I mean if you can't describe - -

A        Yeah, it's - -

Q        Okay.  Shouldn't climb ladders, ropes, or scaffolds, crawl.  He can occasionally climb  ramps and stairs, balance, stoop, kneel, and crouch.  This hypothetical person couldn't repetitively finger.  He would need to work indoors in a temperature-controlled environment with the need to avoid concentrated exposure to hazardous work sites, need to avoid concentrated exposure to hazardous work sites, need to avoid harsh environmental irritants such as noxious odors, fumes, gasses, heavy dust at the work place.  This person's attention and concentration problems would restrict him to simple, routine, repetitive work.  First hypothetical person, would he be able to do work that exists in the regional or national economies in your expert opinion?

A        Let me look at this just a minute, Your Honor.  I think with the restriction that he has with the breathing and the exertion, that he's going to be reduced to more stationary, sedentary-type jobs.  He has offsetting limitations there physically and non-exertionally that are going to give some difficulty looking at jobs.  We might look at something for him, however, like a - - or for this person like a dispatcher position, not a 911 type person, but someone working public service utility or state road garage, you know, that kind of thing.  Those would number - - and they're considered sedentary.  Number approximately 30,000 nationally, 4,000 regionally, looking at West Virginia, Virginia, Ohio, and Kentucky.  They're an SVP 3, there are lower, entry-level type position, demonstration-type jobs.  We might look at something like an information clerk position.  That again is a sedentary position.  They number approximately 15,000 nationally and 2,000 regionally.  Or telephone type jobs.

Q        Is this the third one?

A        Yes, sir.

Q        Okay.

A        Those are approximately 36,000 nationally and 4,000 regionally.  But with the offsetting limitations there is why I bumped it on down - -

ATTY        Could I ask what the third job title was?  I missed that.

VE        Interviewer.  They'd be - -

ALJ        - - like people that do telephone surveying work, that kind of thing.  And they're - - the jobs that I named are all sedentary because of the offsetting limitations there.

BY ADMINISTRATIVE LAW JUDGE:

Q        You found all those work activities to be simple, routine work, repetitive?

A       They're entry level - -

Q       Entry level?

A       - - repetitive, demonstration-type work and one's a person would learn the actual job activities.

Q       All those are DOT described?

A       Yes, sir.  I can give you some representative codes.  Dispatcher for street department, 239.367-030; information clerk, 237.367-018; and charge account clerk, the third one, 205.367-014.

Q       Charge account clerk?

A       Yes, sir.

Q       That's telephone - -

A       Yes, sir.  And those are [inaudible] sedentary.  These would be representative code, but that's - - we'd have to go down to more controlled situation because of that - - those offsetting limitations there.

ALJ         Mr. Miskowiec?

ATTY        Thank you, Your Honor.

*               *               *

[EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY]  (Tr. 669)

Q       You gave us an SVP number for dispatcher.  What's the SVP for information clerk?

A       Those two were two's, I believe.  Let me see - - let me make sure.  One of them may be a three.  I believe they were all two's.  They're all two's but the dispatcher is a three.

Q        And the information clerk, what exactly does that person do?

A        That could vary depending on the work setting, but they will consider people that would provide telephone - - could provide telephone quotations, they could provide - - be people that you would call for parts or cataloging or various - - we can go to the description, which I'm sure you are doing faster than me because you have it on computer.

Q        I don't know how about fast, but - -

A        Because I have to dig out my book.

Q        Well, let me help you with that.  You gave me a cite of 237.367-018.

A        Yes, I did.

Q        And that is your understanding of what information clerk is in the DOT?

A        I would have to read the full description.  I don't have the full description in front of me.

Q        Well, according to this DOT, it's information clerk provides travel information for bus or train patrons, answers inquiries regarding departures.  Does that sound like the job you were thinking of?

A        Did I give you 237.367-046?

Q        No, you didn't.

A        I'm sorry because I gave you the wrong one, because the one I gave you was considered a lighter one, and I meant to give you the sedentary and read the wrong line.  So that's my fault.

ALJ             I had [inaudible].  What did you give?  237 - - -

14

VE          I gave you the one underneath.  I'm sorry.  I can't read my own writing - - I gave you 237.367-018 when I should have given you 237.367-046.

ALJ          - 046?

VE          Yes, sir.

ALJ          Okay.  How did that one pop up?

ATTY          I've got it.

VE          And it says answers telephone calls from customers requesting current stock quotations and provides information posted on electronic quote board, relays calls to registered representative which is - - and this is one working in a brokerage.

BY ATTORNEY:

Q          What's the fingering requirement of that?

A          Well, I'll have to look that one up.

Q          Would it be frequent?

A          It would be my guesstimate on it is that it is frequent.  It's frequent.

Q          So if an individual could do no repetitive fingering with one hand, would this be an appropriate job to identify?

A          It could pose difficulty, yes.

Q          How many jobs of the - - I think you said 50,000 nationally, 2,000 regionally?

A          Somewhere around in there.

ALJ          15,000?

ATTY          I have 50,000.  Maybe I got it wrong.

ALJ          I wrote 15,000, but maybe I misunderstood.

VE             I think I said - - 15,000 is what I said.

ATTY           15,000?

ALJ            1 - 5?

VE             1 - 5, and about 2,000.

BY ATTORNEY:

Q       Of that number of jobs in response to the hypothetical, how many would only

involve fingering of one hand?

A       I can't speak to that.

Q       So we don't - -

A       There - -

Q       - - have any numbers for that restriction?

A       We don't.  Frequently people that work in that type of job use their numerical

keyboard more than - -

Q       How many - -

A       - - they actually type - -

Q       - - of them do that?

A       Most of them do in my experience because in that type of setting, the key is doing

a lot of numerical work.

Q       This is for the telephone quotation clerk?

A       Which is indicated as a brokerage-type job.

Q       What are they keying in on the number pad?

A       They're keying in purchases for people are buying or selling [inaudible] entering

data or numbers of shares or entering in queue numbers on stocks and then the numbers of shares and that kind of thing in that particular descriptive.

Q       Okay.  So you're buying shares - -

A       But they do a lot of numerical work.

Q       - - and you want it done quickly so that the price doesn't change.

A       It must be done accurately.

Q       And you're calling in to a guy who only uses one hand?  Would you want him doing that on your quote with one hand?

A       I've already said I think that that could pose difficulty.

Q       All right.  When the Judge told you to assume that there was very little walking at the job site, what period of walking did you have in mind?

A       I assumed a person doing extended or prolonged walking, as we would see in light jobs, because we have an RFC that's light but yet he limited it with the walking which, to me, a person that can't do - - that's required to do very limited walking probably cannot meet the requirements to stand and walk six hours of an eight-hour day which was another factor that I considered when I indicated I felt that there were offsetting limitations with what we would typically consider light jobs which are standing and walk and moving about the workplace.

Q       So did you understand it to mean the walking requirements of sedentary work?  Is that what you're testifying to?

A       No.

Q       Did you - -

A       However, if a - -

Q      Let me ask this question.  Did you understand it to mean the requirements in excess of the sedentary limitations as far as walking?

A      I understood it to mean that the person would have very limited capability to walk on an extended basis during the course of the workday.  And if a person cannot do that, then in all likelihood, in my opinion, they are not going to be able to sustain the walking required to do the full range of light activity.

*                *                *

Q      Okay.  Just bear with me for one second, Judge.  I'll check one thing and then I'll be quiet.  The jobs you identified, which we now have as telephone clerk, credit card - - charge account clerk, and dispatcher, the dispatcher is an SVP of 3, correct?

A      Right.

Q      And that means that it would take more than 30 days to learn the job?   That correct?

A      Yes.

Q      So by its definition, it would not be unskilled under the regulations?

A      No, it's - - I said it's the very lower limits of semi-skilled which are typically jobs that are learned on the job.

Q      Would you equate the very low level of semi-skilled to entry level?

A      To me, they're very close.

Q      But they're not the same?

A      They're very similar.

Q      Are they the same?

A      They're not the same.

Q      Okay. So if you describe dispatcher as entry level, that was incorrect?

A      To me, they are very much the same. We don't typically see people that work at an SVP of 3 achieve a high level of skill that qualifies them across the board for many other occupations. The skills that they learn are generally task-specific or job-specific to equipment or processes that are not transferable really and don't qualify people to other jobs. So they are very much alike in that regard. They do require a little more in the way of judgment activity and that kind of thing. But they are - - they aren't jobs that require higher education or certificates and that kind of thing.

*        *        *

E.      <u>Lifestyle Evidence</u>

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

- Watches television. (Tr. 154)

- Leaves house to help pastor at church with small projects. (Tr. 154)

- Able to care for his personal hygiene without any reminders. (Tr. 155)

- Prepares his own meals, including sandwiches, cereal, and fried eggs. (Tr. 156)

- Does his laundry once his week. (Tr. 156)

- Mows a small yard once a week, for 2-3 hours. (Tr. 156)

- Makes his own bed. (Tr. 156)

- Goes outside daily. (Tr. 157)

- Walks a short distance. (Tr. 157)

- Borrows his wife's car and rides with friends. (Tr. 157)

- Able to drive a car. (Tr. 157)

- Shops in stores for personal items and hunting supplies. (Tr. 157)

- Able to pay bills and count change. (Tr. 157)

- Attends church three times per week, for an hour service. (Tr. 158, 650)

- Has dinner with friends twice per month. (Tr. 158)

- Talks with friends on the phone daily. (Tr. 158)

- Plays cards with friend and friend's mother fives times a week for an hour at a time. (Tr. 158)

- Helps with Sunday School at church. (Tr. 158)

- Can walk one block before needing to rest. (Tr. 159)

- Able to do gardening and home repairs with a respirator mask. (Tr. 161)

- Takes a nap during the day. (Tr. 175)

- Sometimes does household chores including vacuuming, repairs, lawn care, mopping floors, loading the dishwasher, running errands, and taking out the trash. (Tr. 176)

- Able to follow written and spoken instructions. (Tr. 178)

- When able, works around the outside of the house. (Tr. 661)

- Goes hunting when weather permits; sometimes waits in car while friends hunt. (Tr. 230-31)

### III.  The Motions for Summary Judgment

A.  <u>Contentions of the Parties</u>

Claimant argues the ALJ erred in finding his mental impairments (including depression and other mental limitations stemming from childhood abuse) were not severe. Claimant also alleges the ALJ failed to meet his burden at step five of the sequential analysis because he failed to show there existed a significant number of jobs in the national economy that accommodated Claimant's limitations. Commissioner contends substantial evidence supports the ALJ's determination Claimant's mental impairment was not severe. Commissioner further contends the ALJ met his burden at step five of the sequential analysis.

B.    The Standards.

1.    Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.     <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4.     <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.     <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.     <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.     <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot

determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.  <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.  <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.  <u>Discussion</u>

1.  <u>Whether the ALJ Erred in Concluding Claimant's Mental Impairment Was Not Severe</u>.

Claimant argues the ALJ erred in finding his mental impairments (including depression and other mental limitations stemming from childhood abuse) were not severe.  He also alleges the ALJ should have ordered a psychological evaluation.  Commissioner contends

substantial evidence supports the ALJ's determination Claimant's mental impairments were not severe, and that the ALJ had no duty to order a psychological evaluation.

The ALJ concluded Claimant suffered from the following severe impairments: respiratory distress syndrome, left cubitus valgus deformity of the left elbow, degenerative disc disease of the cervical spine, degenerative disc disease of the lumbar spine, bilateral carpal tunnel syndrome with status post bilateral carpal tunnel release and peripheral neuropathy. (Tr. 29). The ALJ concluded Claimant did not suffer from a severe impairment. (Tr. 35). In so concluding, the ALJ relied on medical records from two state agency reports, and evidence of Claimant's lifestyle. (Tr. 35). The Court finds the ALJ's conclusion is supported by substantial evidence. Although Claimant was diagnosed by several doctors as suffering from depression, (413, 467, 598, 611), both state agents who reviewed Claimant's file and completed a Psychiatric Review Technique Form concluded Claimant did <u>not</u> suffer from a severe impairment. (Tr. 315, 449). Furthermore, the record does not support the degree of mental limitation alleged by Claimant. For example, while Claimant testified at the hearing he experiences crying spells, (Tr. 653), and although his wife testified he suffers from depression, (Tr. 660), Claimant retains the ability to attend church, interact with his pastor, do household chores, play cards, and accompany friends hunting. (Tr. 154, 176, 230).[5]

In concluding the ALJ's determination is supported by substantial evidence, the Court

_____

[5] Citing <u>Wilson v. Heckler</u>, 743 F.2d 218, 221 (4th Cir. 1985), Claimant alleges the ALJ committed reversible error by relying on Claimant's ability to concentrate and answer questions during the hearing as evidence Claimant's mental impairment was not severe. (<u>See</u> Tr. 35). Claimant's allegation is without merit. Pursuant to SSR 96-7p, an ALJ may consider his own observations of the claimant at the hearing "as part of the overall evaluation of the credibility of the claimant's statements."

has considered Dr. Shaver's and Dr. Morgan's reports, (Tr. 607, 611), and finds they support, as oppose to challenge, the ALJ's determination. Dr. Shaver, for example, concluded Claimant was "severely" impaired in pace, but only "mildly deficient" in concentration, and "within normal limits" for judgment and immediate memory. (Tr. 607). Dr. Shaver ultimately concluded Claimant retained the mental RFC to operate in routine, low-stress, work situations. Dr. Morgan, similarly, diagnosed Claimant with major depressive disorder, but concluded Claimant was only mildly to moderately deficient in the areas of recent recall, remote recall, and concentration. (Tr. 611).

Regarding Claimant's allegation the ALJ had a duty to order a psychological evaluation, his allegation is without merit. Relying on White v. Barnhart, 321 F. Supp. 2d 800 (N.D.W.Va. 2004), Claimant argues his testimony, his wife's testimony, and reports from Drs. Orvik, Ducatman, and Rahman gave rise to the ALJ's duty to order a psychological evaluation to further develop the issue of the claimant's mental limitations. Claimant's reliance on White is misplaced. In White, the claimant complained of daily panic attacks; was diagnosed with multiple mental impairments including agoraphobia, panic disorder, and anxiety disorder; was noted to have moderate to marked functional limitations; and assigned a GAF of 45. The White Court considered the evidence in the record, evidence Claimant's condition had worsened, and the absence of any medical opinion stating medication or treatment could control Claimant's mental impairments to the extent necessary to work, and held the ALJ erred by failing to order a psychological evaluation. White is inapplicable to the present case because Claimant's symptoms, and his degree of functional limitations are far less severe than of the claimant in White. Contrary to Claimant's assertion, the reports from Drs. Ducatman, Orvik, and Rahman

do not establish the ALJ's duty to order a psychological evaluation. Dr. Ducatman, for example, stated Claimant had "limited intellectual and/or emotional means," but added that his "impression" required "formal confirmation if important." (Tr. 284). Similarly, Dr. Orvik concluded Claimant suffered from depression, but failed to cite to any objective evidence to support his conclusion. (Tr. 413). Finally, Dr. Rahman concluded Claimant had "anxiety and depression," but failed to establish Claimant's depression poses any significant limitation on his ability to work. (Tr. 464-66). For these reasons, the ALJ did not err by failing to order a psychological evaluation.

   2. <u>Whether the ALJ Failed to Meet His Burden at Step Five of the Sequential Analysis</u>.

  Claimant alleges the ALJ failed to meet his burden at step five of the sequential analysis because 1) the VE failed to identify the incidence of the jobs in the national and regional economies; 2) the hypothetical did not accurately reflect Claimant's walking limitation; 3) the VE erroneously concluded the job of dispatcher was "entry level" work; 4) Claimant's limitations prevent him from performing the jobs cited by the VE. The Commissioner argues Claimant's allegations do not warrant relief.

  The ALJ concluded Claimant retained the following RFC: "to lift and carry 20 pounds occasionally and 10 pounds frequently. He must lift primarily with the right arm, using the left arm for balance. He can perform no extended walking at the job site. He must avoid activities involving pushing and/or pulling with his left upper extremity. He can occasionally balance, stoop, kneel, crouch and climb ramps and stairs. He can never crawl or climb ladders, ropes, or scaffolds. He must avoid repetitive fingering. He requires indoor work activity with a temperature controlled environment. He must avoid concentrated exposure to hazards, such as

heights and dangerous machinery. He must avoid harsh environmental irritants at the workplace. Also, he has a problem with attention and concentration due to pain, which restricts him to simple, routine, repetitive work activity. (Tr. 36).

At the hearing, the ALJ asked the VE to consider an individual with the following limitations: "[l]ifting only 20 pounds occasionally, ten frequently, with the lifting being done principally with the right arm, left arm being used for balance, . . . no pushing or pulling with the left upper extremity; very limited walking at the job site; . . . Shouldn't climb ladders, ropes, or scaffolds, crawl. He can occasionally climb ramps and stairs, balance, stoop, kneel, and crouch. This hypothetical person couldn't repetitively finger. He would need to work indoors in a temperature-controlled environment with the need to avoid concentrated exposure to hazardous sites, need to avoid harsh environmental irritants such as noxious odors, fumes, gasses, heavy dust at the work place. This person's attention and concentration problems would restrict him to simple, routine, repetitive work." (Tr. 667).

The ALJ then asked the VE whether there existed any jobs in the regional or national economy that met the hypothetical individual's limitations. (Tr. 667). The VE responded in the affirmative and identified the jobs of non-emergency dispatcher, information clerk, and telephone interviewer.

1) <u>VE's failure to identify incidence of the jobs in regional and national economies</u>.

Relying on SSR 96-9p, Claimant alleges the ALJ failed to meet his burden at step five because the VE did not identify the incidence of the cited jobs in the national and regional economy. Claimant allegation is without merit because the VE did identify the incidence of the three jobs in the national and regional economies. (<u>See</u> Tr. 668).

2) <u>Failure of hypothetical to accurately reflect Claimant's walking limitation</u>.

Claimant alleges the ALJ misrepresented Claimant's walking limitation to the VE.
Claimant's RFC reflected Claimant could "perform no extended walking at the job site." (Tr.
36). At the hearing, the ALJ asked the VE to consider a limitation of "very limited walking at
the job site." (Tr. 667). Claimant contends the latter representation of the walking limitation
misrepresents his limitation. The Court disagrees. An ALJ has a duty to ensure the hypothetical
"adequately reflect[s]" a claimant's limitations. See <u>Johnson v. Barnhart</u>, 434 F.3d 650, 659 (4th
Cir. 2005). There is no evidence the subtle change in phrasing of Claimant's walking limitation
so altered its meaning that the hypothetical, or the VE's response, was rendered faulty. To the
contrary, the VE testified she interpreted the limitation to mean "the person would have very
limited capability to walk on an extended basis during the course of the day . . . [T]hey are not
going to be able to sustain the walking required to do the full range of light activity." (Tr. 675).
Furthermore, Claimant has failed to demonstrate the jobs cited by the VE require extended
walking or more than limited walking.

3) <u>VE's characterization of the dispatcher job as "entry level" work</u>.

Claimant next alleges the ALJ erred in relying on the VE's testimony because the VE
erroneously concluded the job of non-emergency dispatcher qualified as "entry level" work,
despite having a specific vocational preparation (SVP) of 3. Claimant's allegation is without
merit.

The ALJ in the present case limited Claimant to "simple, routine, repetitive" work
activity. (Tr. 36). At the hearing, the VE testified the jobs of dispatcher, information clerk, and
telephone interviewer were "entry-level, repetitive, demonstration-type work." (Tr. 669). Later

28

in the hearing, the VE testified the job of non-emergency dispatcher had an SVP of 3, and that a

job with an SVP of 3 would take more than 30 days to learn.  (Tr. 678).  When asked to confirm

that the job was therefore <u>not</u> unskilled, the VE responded, "[n]o, it's - - I said it's the very lower

limits of semi-skilled which are typically jobs that are learned on the job."  (Tr. 679).  The VE

then explained that in her experience, "entry level" and "semi-skilled" are "very much the same"

because "people that work at an SVP of 3 [typically don't] achieve a high level of skill that

qualifies them across the board for many other occupations."  (Tr. 679).

     While the Code of Federal Regulations makes a clear distinction between unskilled (or

entry-level) work and semi-skilled work, <u>see</u> 20 C.F.R. § 404.1568, the ALJ reasonably relied on

the VE's explanation of why the dispatcher job was, in her experience, "entry-level" work.  <u>See</u>

SSR 00-4p ["Reasonable Explanations for Conflicts (or Apparent Conflicts) in Occupational

Information: . . . Evidence from VEs or VSs can include information not listed in the DOT . . .

Information about a particular job's requirements . . . may be available from a VEs or VSs

experience in job placement . . . ."].  Furthermore, because the VE sufficiently explained the

reasons for the discrepancy between her testimony and the DOT listing, the ALJ was not

obligated to obtain any further clarification from the VE before relying on the VE's testimony.

<u>See</u> SSR 00-4p [providing "when there is an apparent unresolved conflict between VE or VS

evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict

before relying on the VE or VS evidence . . .].

     4) <u>Claimant's inability to perform the jobs cited by the VE</u>.

     Claimant alleges the ALJ erred in relying on the VE's testimony Claimant could perform

the three jobs cited, because Claimant alleges he cannot perform the "frequent fingering"

requirement of information clerk, and the "frequent reaching and handling" requirement of all three jobs.

     i.  *Limitation on "frequent fingering"*

Claimant alleges he is unable to perform the "frequent fingering" requirement of "information clerk," because the ALJ found Claimant must "avoid frequent fingering." Claimant's allegation is meritorious. The ALJ found Claimant must "avoid repetitive fingering." (Tr. 36). As stated in the DOT, the job of information clerk requires "frequent fingering." (Tr. 255). Because "repetitive fingering" reasonably equates to "frequent fingering," Claimant's RFC appears to be in conflict with the job's requirements. The VE expressed her agreement, stating "it could pose difficulty" if an individual working as an information clerk could not do repetitive fingering with one hand. (Tr. 673). The ALJ, therefore, erred in relying on the VE's testimony Claimant could perform the job of information clerk. The error does not warrant remand, however, because, as discussed below, Claimant retains the ability to work as a dispatcher or telephone interviewer, such that the ALJ met his burden at step five.

     ii.  *Limitation on "reaching and handling"*

Claimant alleges he is unable to perform the "frequent reaching and handling" requirement of all three jobs because the ALJ found Claimant must "avoid activities involving pushing and/or pulling with his left upper extremity." Claimant is correct the jobs require "frequent reaching and handling," (Tr. 252, 255, 258), and is correct the ALJ found he must "avoid activities involving pushing or pulling with his left upper extremity." (Tr. 36). However, Claimant's allegation does not warrant relief because Claimant has failed to demonstrate that "reaching and handling" involves the sort of "pushing or pulling with the left upper extremity"

imagined by the ALJ.  Accordingly, there is no evidence Claimant's push/pull limitation prevents him from being able to meet the reach/handle requirements of non-emergency dispatcher and telephone interviewer.

### IV.  Recommendation

For the foregoing reasons, I recommend that:

1.  Claimant's Motion for Summary Judgment be **DENIED** because 1) substantial evidence supports the ALJ's conclusion Claimant did not suffer from a severe mental impairment, and 2) there is no evidence the ALJ failed to meet his burden at step five of the sequential analysis.

2.  Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: July 11, 2008

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE